**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                        )
FADI KANAFANI,                          )
                                        )
        Plaintiff,                      )        Civil Action No.: 07-11 (JLL)
                                        )
v.                                      )
                                        )            **OPINION**
LUCENT TECHNOLOGIES INC.,               )
                                        )
        Defendant.                      )
_____)

**LINARES**, District Judge.

This matter comes before the Court on the motion for summary judgment filed by

Defendant Lucent Technologies Inc. ("Lucent").  Plaintiff Fadi Kanafani commenced this action

alleging that he was terminated from his employment with Lucent Technologies International Inc.

("LTII"), a subsidiary of Lucent, because of whistle-blowing activity.   He asserts claims against

Lucent for violations of New Jersey's Conscientious Employee Protection Act ("CEPA"),

N.J.S.A. §§ 34:19-1 to 34:19-8, and New Jersey's Wage and Hour Law, N.J.S.A. § 34:11-4.1; he

has not brought any claims directly against LTII.  The Court has considered the parties'

submissions[1] and decides this matter without oral argument pursuant to Rule 78 of the Federal

---

[1]The original statements of undisputed fact and supplemental statement of material
disputed facts submitted by the parties pursuant to Local Civil Rule 56.1 were found by this
Court not to conform to Rule 56.1.  The Court ordered the parties to resubmit the statements.
Defendant resubmitted its statement of undisputed facts and Plaintiff resubmitted its counter-
statement to Defendant's submission.  Plaintiff did not resubmit his supplemental statement of
material disputed facts.  Therefore, the Court has considered the fact statements in Plaintiff's
original supplemental submission only in so far as they are specifically referenced in his other

Rules of Civil Procedure.  For the reasons set forth below, Lucent's motion for summary

judgment is granted in part and denied in part.

## I.    <u>BACKGROUND</u>

Mr. Kanafani resides in Dubai, United Arab Emirates (UAE), and in Texas.  (Def.'s

Revised Stmt. of Undisputed Mat'l Fact Pursuant to Local Civ. R. 56.1 ¶ 1 [hereinafter Def.'s

Fact Stmt."].)  He has never resided in New Jersey.  (<u>Id.</u> at ¶ 2.)  Lucent is a corporation whose

New Jersey headquarters are in Murray Hill, New Jersey.  (<u>Id.</u> at ¶ 3; Br. in Supp. of Def.'s Mot.

For Summ. J., at 8 [hereinafter "Moving Br."].)

Mr. Kanafani was employed by Lucent until June 30, 2000.  (Def.'s Fact Stmt. ¶¶ 4-5.)

Beginning July 1, 2000, until his termination on August 31, 2006, Mr. Kanafani was employed by

LTII pursuant to a series of employment agreements.  (<u>Id.</u> at ¶¶ 6, 8, 11, 63.)  The last employment

agreement was executed between Mr. Kanafani and LTII in the UAE, for employment in the

UAE, on April 24, 2004.  (<u>Id.</u> at ¶¶ 8-9; Cert. of Kerry M. Parker in Supp. of Def.'s Mot. for

Summ. J. [hereinafter "Parker Cert."], Ex. H.)  The Agreement provided that "[a]ll disputes

between the parties arising out of the employment relations or connected therewith, will be settled

by the UAE courts of law and according to the UAE laws."  (Parker Cert., Ex. H, ¶ 19.)

Mr. Kanafani was employed by LTII as a Senior Sales Manager, and he was regularly

recognized as a top salesman while employed by LTII.  (Def.'s Fact Stmt. ¶ 19; Opp'n Br., Ex. M,

Taylor Dep., Tr. 48:4-7.)  For example, in January 2003, he received a letter from Lucent

President and Chief Executive Officer Patricia Russo, located in New Jersey, selecting him as a

---

supporting papers.

2002 Achievers Club winner for his "significant contribution to sales effort in fiscal 2002." (Pl.

Fadi Kanafani's Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. [hereinafter "Opp'n Br."],

Ex. U, Ltr. dated Jan. 6, 2003.)  In November 2004, Mr. Kanafani again received recognition from

Lucent for his sales efforts.  (See id., Ex. V, Ltr. dated Nov. 8, 2004 from Ray Adams (President

Lucent MEA) & Bob Warstler (President Global Sales).)  Then in 2005 he was given a Star

Award recognizing him as one of top sales managers in the company.  (See id., Ex. M., Taylor

Dep., Tr. 45:10-46:13.)

　　　　During his employment with LTII, Mr. Kanafani first reported to Sid Taylor and then to

Imad Hoballah.  (Def.'s Fact Stmt. ¶ 17.)  From late 2005 until October or November 2006 Mr.

Taylor was Director of Sales Operations in the Middle East and Africa.  (Opp'n Br., Ex. M,

Taylor Dep., Tr. 6:16-7:10.)  Mr. Hoballah and Mr. Taylor reported to Talmage Bursh, "president"

of LTII for the Middle East and Africa.  (Def.'s Fact Stmt. ¶ 18.)  Although externally Mr. Bursh

was referred to as LTII's President of the Middle East and Africa, he was actually a vice president

of LTII.  (Opp'n Br., Ex. X, Bursh Dep., Tr. 85:24-86:6.)  To Mr. Bursh's knowledge there was

no president of LTII.  (Id. at 85:24-86:6.)  He testified that his belief is that LTII is "a legal

structure versus an organizational structure."  (Id.)  Thus, although Mr. Bursh ran LTII in the

UAE, he reported to Mr. Brewington, Lucent's President of Business Development located in

New Jersey.  (Def.'s Fact Stmt. ¶ 30.)

　　　　Mr. Brewington was responsible for overseeing Middle Eastern operations for Lucent and

for general global business development.  (Opp'n Br., Ex. W, Brewington Dep., Tr. 8:16-19.)  He

testified that he spoke to Mr. Bursh approximately "a couple times a month."  (Id. at 35:10-17.)

Mr. Bursh testified that he and Mr. Brewington spoke by phone "[t]ypically once a week."  (Id.,

Ex. X, Bursh Dep., Tr. 45:19-46:6.)  Mr. Brewington testified that he and Mr. Bursh discussed customer business, yearly objectives, and financial objectives.  (Id., Ex. W, Brewington Dep., Tr. 35:18-37:9.)  Mr. Bursh testified that when Mr. Brewington would visit the UAE, he would meet with various managers, and they "would discuss business strategy and opportunities and . . . financial results" and sometimes they "would discuss employees that reported to [him]."  (Id., Ex. X, Bursh Dep., Tr. 46:7-47:8.)  Mr. Bursh also testified that he and Mr. Brewington "would discuss compliance that [LTII was] doing for the Federal Foreign Corruption Practices Act ["FCPA"]."  (Id. at 49:7-12.)

Mr. Kanafani was trained on the FCPA in the UAE and also participated in mandatory web-based training on the FCPA administered by Lucent in New Jersey.  (Id., Ex. A., Kanafani Dep., Tr. 97:22-98:14.)  Mr. Kanafani also received live and mandatory web-based training on Sarbanes-Oxley.  (Id., Ex. J., Kanafani Dep., Tr., 153:24-155:5.)  Nour Lawland, another LTII former-employee, certified that "[d]uring [his] employment with Lucent, [he] was directed by management to contact the United States location(s) of Lucent if there were concerns or problems with compliance with the Sarbanes Oxley Act or Foreign Corrupt Practices Act."  (Id., Ex. O, Nour Lawland Aff. ¶ 24.)

In 2006, Mr. Kanafani discovered what he believed were compliance issues with LTII's financial reporting.  On April 15, 2006, he anonymously sent an email entitled "FCPA Infraction" to Lucent in New Jersey, including to Steve Rosen, an attorney in Lucent's Legal Department in New Jersey.  (Parker Cert., Ex. I.)  The email alleged that LTII revenue numbers were improperly adjusted, and that numerous people, including Mr. Bursh, were "aware of the infraction and decided to just keep it low key to show that the MEA region made its quarterly commitments."

(Id.)  The email was sent from an anonymous email account called "Senior Citizen."  (Id.)  Mr.

Rosen replied to the email, stating:

> Please allow me to take the lead here with Gregg Palesky to do a review.  We will
> involve you as necessary.  If you have specific information useful in the review,
> please let Gregg or myself know.

(Id.)  Mr. Kanafani responded by suggesting interviews of several people.  (Id.)  Mr. Kanafani

inadvertently signed the second email "Thanks, Fadi."  (Id.)

Mr. Kanafani asserts that subsequent to sending the e-mails, he began having problems

getting cooperation on his projects from high-level managers.  (Opp'n Br., at 24.)  He also

testified that Mr. Taylor said to him: "We're not able to pinpoint who [sent the] e-mail . . . .  They

have a few suspects in mind, but we believe Dr. Hoballah did it."  (Id.., Ex. A, Kanafani Dep.,

140:16-141:6.)  With respect to the emails Mr. Kanafani sent to Lucent in New Jersey, Mr. Taylor

testified:

> [T]he first indication of this senior citizen thing was that Joost Steinen, . . .
> CFO [of LTII], called me in . . . and says, let me show you this email.  Did you send
> it?  And I looked at it and said, I didn't send that.
> They had though it might be me, because it was signed "senior citizen" and
> I was probably the most senior guy around after the last nine and a half, ten years at
> that time.

(Id., Ex. M., Taylor Dep., Tr. 56:22-9.)  He further testified:

> Q:  [W]ere you aware that either Mr. Steinen or Mr. Bursh or anyone in management
> in the Middle East was actively seeking to try to figure out who wrote the
> [anonymous] email?
> A: Yes.
> Q: How were you aware that they were trying to –
> A: [Mr. Steinen] told me that they were trying to find out who sent it. I think they had
> gone through the formal process when it arrived. Obviously, when you got Steve
> Rosen, who is the company's counsel, and you had Jim Brewington, who is the
> officer in charge of the region, they would have gotten–immediately bypassed the
> local team and went straight [to] the most senior team for resolution of the issue.

Q: When you say bypass the local team, what do you mean?

A: Well, I was the compliance chairman, and something like this, normally, if I would have been there–but I was on vacation. . . . I would have started a case on it and gone through the formal process of notification and investigation.

Q: Are you saying they bypassed Mr. Bursh and Mr. Steinen and went directly into the investigation?

A: No, I don't know how they investigated it.  Because it started out while I was gone. . . . But it did not go through the compliance council, compliance process in the Middle East and Africa.  It went–I think because it started with Steve Rosen and Jim Brewington, I believe then it just sort of went right up to the top level. . . .

(Id. at 58:24-60:23.)

\*       \*       \*

Q: Are you aware if Mr. Steinen was interviewing people or informally asking around to see who sent that email?

A: Well, I think he just asked me, because he thought–he maybe thought I'm the one who sent it, and he was pretty upset when he gave it to me.  I read it, and I told him I didn't send it.

(Id. at 61:6-15.)

\*       \*       \*

Q: Are you aware if they had narrowed down the names of the individuals who they thought may have written the email?

A: When I said I didn't send it, then [Mr. Steinen] was saying, well, then I wonder who did, and I said, I have no clue.  He seemed to think that it could have come from Fadi [Kanafani] or Imad Hoballah . . . .

(Id. at 62:16-63:3.)

\*       \*       \*

Q: Besides Mr. Steinen, was there anyone else in management who spoke to you about the email?

A:  Nope, not . . .[the anonymous one].

Q:  Well, what about on a subsequent email?

A:  There was a subsequent email that came in, and it didn't come from senior citizen. . . .

Q: You said it didn't come from senior citizen.  Who did it come from?

A: I can't recall. . . . But . . . I was given a copy of it, and I launched an investigation into it.

Q: What was it alleging?

A: Again . . . I don't have the documents in front of me.  But, . . . it was more direct by naming [Mr. Bursh] and Mike Parker as doing some things that needed to be reviewed. And I don't have any of the documents in front of me . . . so I'm not even going to try to say what it was about.

Q: That's fine. Did anyone implicate Mr. Kanafani as sending that subsequent email?

A: Talmage Bursh told me he had some ideas who might be sending it; that he was going to talk to Lucent securities to see if they could do a trace on this email to find

out where it came from.  And that was that.

Q: Did he say any names of people who he thought might be sending it?

A: I wish I could recall better, but he did not, in my mind, say that Imad [Hoballah] or Fadi [Kanafani] sent it.

(Id. at 68:10-70:10.)

*       *       *

Q: But you do remember him saying that he was going to do a trace, and he was actively seeking to figure out who sent the email?

A: That's correct.  And I don't know if they ever found out who sent it because nothing was resolved.  No one gave me the results of anything.

(Id. at 70:19-71:5.)

*       *       *

Q: Okay.  Now, besides Mr. Bursh, did anyone else speak to you about the second email?

A: I'm trying to think.  I think [Mr. Steinen] mentioned again that there was another email.

(Id. at 73:12-17.)

Mr. Taylor also testified that he was not aware of anyone else working in the Middle East named "Fadi."  (Id. at 97:4-8.)  He stated that "had [he] seen an email and it said Fadi, [he] wouldn't have thought of anyone else but Fadi [Kanafani]."  (Id. at 97:18-21.)  Mr. Bursh also testified that he was aware of only one Fadi employed by Lucent.  (Id., Ex. X, Bursh Dep., Tr. 125:10-14.)

Mr. Bursh testified that, when he made the decision to terminate Mr. Kanafani, he was unaware that Mr. Kanafani was the author of the e-mails.  (Id. at 124:18-24.)  He acknowledged that the email labeled "FCPA Infraction" was forwarded to him by Mr. Steinen, but testified that the email signed "Thanks, Fadi" was not shared with him. (Id. at 103:19-104:11, 105:6-9, 129:3-15.)  Mr. Bursh also testified that he was not " kept abreast of the status of the investigation," and that he "never discussed [who might be sending the e-mails] with anyone." (Id. at 108:9-11; 114:4-14.)  He stated that he did not have any ideas about who could have authored the e-mails, that "he never suspected Fadi would have sent the e-mails," and he that "certainly did not ask anyone within the company to trace the emails" and was "not aware of any request" to do so.  (Id.

at 114:15-17; 116:19-20, 118:15-20.)

Mr. Bursh terminated Mr. Kanafani's employment on or about June 20, 2006.  (Def.'s Fact Stmt. ¶ 56.)  Mr. Bursh testified that, because of the need to cut costs, he determined that a reduction in force ("RIF") of LTII employees was necessary.  (Id., Ex. X, Bursh Dep., Tr. 57:21-58:9.)  He stated that he decided to include Mr. Kanafani in the RIF because he "had nothing going on in terms of future sales coming in and had sold nothing recently."  (Id. at 148:4-149:20.) Mr. Bursh testified that the final decision on who to include in the RIF was his alone.  (Id. at 67:7-21.)  Mr. Brewington testified that at the time of Mr. Kanafani's termination, he did not know Mr. Kanafani.  (Id., Ex. W, Brewington Dep., Tr. 44:2-8.)

As part of his termination, Mr. Kanafani was given two month's pay in lieu of notice even though his employment agreement only entitled him to one month's notice.  (Def.'s Fact Stmt. ¶¶ 60-61.)  However, he was not allowed to work during his notice period.  (See Opp'n Br., Ex. A, Kanafani Dep., Tr. 157:22-158:4.)  Mr. Kanafani testified that, upon termination, he "was escorted to the door[,] [his] PC was taken from [him,] [and his] telephone was stopped . . . as if [he] had done a crime."  (Id. at 158:2-4.)  He testified that such treatment was not normal.  (Id. at 157:22-158:1.)  In contrast, for example, Mr. Alamoudi, who was laid off as part of a RIF in 2007, certified that he was permitted to work his three month notice period, given continued access to the building, his e-mail, and his computer, and was not escorted out by security.  (Id., Ex. P, Alamoudi Aff. ¶ 22.)

In exchange for his notice pay, on or around August 2, 2006, Mr. Kanafani executed a Final Settlement Declaration.  (Def.'s Fact Stmt. ¶ 62; Parker Cert., Ex. S.)  The Settlement Declaration provided:

> By signing this Final Settlement Declaration, I confirm that I have no further rights or claims to any past or future payments or refunds or reimbursements from the Company inside or outside the UAE, except for the SCP payout for the month of July & August 2006, which will be paid at a later date, once calculated.

(Parker Cert., Ex. S.)  Mr. Kanafani's LTII employment officially ended on August 31, 2006.

(Def.'s Fact Stmt. ¶ 63.)

Mr. Taylor testified that at the time of Mr. Kanafani's termination "there was a lot of pressure" to reduce costs because LTII was not "delivering on revenue" and only a few people were "hitting the numbers."  (Opp'n Br., Ex. M, Taylor Dep., Tr. 92:24-93:4; 106:8-10.)  But, he stated that he was surprised Mr. Kanafani was terminated because, in his opinion, Mr. Kanafani was one of LTII's top salesmen and "was probably one of three salesmen that were delivering on their plan and had a chance of surpassing their plan for the year."  (Id. at 48:4-7, 91:24-92:10; 103:5-13.)  He testified that although Mr. Kanafani was not currently meeting his sales goals, "he was close to it," and that LTII "hadn't been able to recognize [some of his sales] revenue [yet] because of the issues with the customer and services, but [recognition] was imminent."  (Id. at 103:19-104:9.)  In his opinion "[i]t was just a matter of . . . a few weeks[;] we were going to have all the issues resolved when he was let go."  (Id. at 104:12-15.)  He further testified that "unfortunately, letting him go, we went back to square zero in Ethiopia and started over again with trying to resolve things, and it just went nowhere[;] [b]y him leaving, we gave up the momentum and progress we had had on getting the revenue."  (Id. at 104:16-23.)

Around July 19, 2006, during his notice period, Mr. Kanafani was contacted by Phillip Rosenthall about a position with Lucent in Texas, a Verizon Wireline position.  (Def.'s Fact Stmt. ¶¶ 67-69.)  At the time he contacted Mr. Kanafani, Mr. Rosenthall was Lucent's Vice President of

North American Services Sales; he formerly was located in the UAE and was president of the Middle East and Africa. (Opp'n Br., Ex. W, Brewington Dep., 19:12-20:8.) In response to the query, Mr. Kanafani sent Mr. Rosenthall his resume. (Def.'s Fact Stmt. ¶ 68.) He was interviewed by phone for the position on August 28, 2006, by Robert Mauro, a Lucent sales director, and then interviewed again by telephone on August 30, 2006, by Tom Moore, vice president of the Verizon Customer Team. (Id. at ¶ 69.) On August 30, 2006, Mr. Mauro sent an e-mail to Mr. Rosenthall and Mr. Moore stating that he "plan[ned] to extend [Mr. Kanafani] an offer by the end of the week and [that] he should start on the team on October 1st." (Id. at ¶ 70.) Mr. Kanafani was verbally told of the offer by Mr. Mauro on or around September 6, 2006. (Id. at ¶ 73.) Since Mr. Kanafani was terminated as an employee on August 31, 2006, he had to be further considered for the Texas position with Lucent as an external versus internal candidate. (Id. at ¶¶ 73-74.)

Prior to Mr. Kanafani's August 31 termination date, Mr. Taylor sent an email to Mr. Rosenthall telling him that LTII HR was "willing to place [Mr. Kanafani] in leave without pay status for the month of September if [Mr. Rosenthall was] in a position to hire [him] in October." (See Opp'n Br., Ex. J., Kanafani Dep., Tr. 82:10-18.) Mr. Rosenthall responded that at that time, he was "not at a point where [he] could make a commitment." (See id. at 83:1-6.) Prior to mid-September 2006, "Lucent managers were permitted to hire internal candidates without first obtaining the approval of superiors (as was required for the hiring of external candidates)." (Def.'s Fact Stmt. ¶ 65.) On September 20, 2006, "[Mr.] Mauro informed [Mr. Kanafani] that Lucent could not extend him an offer for the . . . position." (Id. at ¶ 80.)

II.     **LEGAL STANDARD**

A court shall grant summary judgment under Rule 59(c) of the Federal Rules of Civil

Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party first must show that no

genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The

burden then shifts to the non-moving party to present evidence that a genuine issue of material

fact compels a trial.  Id. at 324.   The non-moving party must offer specific facts that establish a

genuine issue of material fact and may not simply rely on unsupported assertions, bare allegations,

or speculation.  See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir.

1999).  Also, the Court must consider all facts presented and the reasonable inferences drawn

from them in the light most favorable to the non-moving party.  See Pa. Coal Ass'n v. Babbitt, 63

F.3d 231, 236 (3d Cir. 1995).

III.    **DISCUSSION**

A.     **New Jersey's Wage & Hour Law**

Lucent argues that because LTII, not Lucent, was Mr. Kanafani's employer, the New

Jersey Wage and Hour Law is inapplicable.  Mr. Kanafani makes no arguments in his opposition

brief regarding this claim or addressing Lucent's arguments.  Additionally, a claim for wages

related to his employment appears to be precluded by the Settlement Declaration executed by Mr.

Kanafani in connection with his termination.  See infra Section C.  Therefore, summary judgment

on this claim is granted.

B.        **Forum Selection and Choice of Law Provisions**

Mr. Kanafani's employment agreement provides: "[a]ll disputes between the parties

arising out of the employment relations or connected therewith, will be settled by the UAE courts

of law and according to the UAE law."  (Parker Cert., Ex. H, ¶ 19.)   Lucent argues that this clause

makes clear that Mr. Kanafani's suit should have been brought in the UAE and is governed by

UAE law, and that, as a result, the present suit should be dismissed.[2]  Although Mr. Kanafani does

not dispute that his employment agreement contained this provision or that he signed the

agreement, he nevertheless argues that the clause is unenforceable in this case.

In support of its argument that UAE law should apply in this case based on the contractual

choice of law provision, Lucent relies in part on Nuzzi v. Aupaircare, Inc., No. 07-3968, 2008

U.S. Dist. LEXIS 1215 (D.N.J. Jan. 8, 2008).  The district court in Nuzzi granted summary

judgment for defendants, holding:

> A New Jersey resident can contract for different state law to be applicable to
> her claims, even if the claims implicate New Jersey law. Plaintiff's status as a New
> Jersey resident does not relieve her of her contractual obligations with APC.
> California does bear a substantial relationship to the parties since APC is
> incorporated and headquartered in that state, and the Court finds that California is not
> so inconvenient of a forum as to deprive Plaintiff of her right to assert discrimination
> claims.
>
> Further, the fundamental policy behind California's employment
> discrimination laws is the same as New Jersey's–to protect the states' residents from
> employment discrimination. Moreover, application of California law does not
> deprive Plaintiff of any remedy. On the contrary, if Plaintiff prevailed in under

---

[2] Lucent states that this court previously has upheld a choice of law provision in an LTII contract providing for application of Saudi law.  (Moving Br., at 12.)  However, in that case, unlike here, both parties agreed that Saudi Law governed the dispute. See Nat'l Group for Communs. & Computers Ltd. v. Lucent Techs. Int'l Inc., 331 F. Supp. 2d 290, 293 (D.N.J. 2004).

> FEHA, the same relief would be available to her as the relief provided under New Jersey law. Therefore, the Court finds that the choice of law provision contained in Plaintiff's employment contract is valid and enforceable.

2008 U.S. Dist. LEXIS 1215, at *7-8.  In an unpublished decision, the Third Circuit disagreed and vacated this decision.  See Nuzzi v. Aupaircare, Inc., No. 08-1210, 2009 U.S. App. LEXIS 18000, at *7 (3d Cir. Aug. 12, 2009).  Relying on the New Jersey Supreme Court's decision in Garfinkel v. Morristown Obstetrics & Gynecology Associates, P.A., 168 N.J. 124, 773 A.2d 665 (N.J. 2001), the court held that "the language in Nuzzi's contract with APC is not broad enough to encompass her statutory [discrimination] claims under the NJLAD or NJFLA, and thus the choice of law clause should not apply to them." 2009 U.S. App. LEXIS 18000, at *6.  The court held that in order to be enforceable such a clause must unambiguously waive any statutory rights, and that the contract in question did not do so.  Id.  The court further held that "[t]he choice of forum provision in Nuzzi's agreement . . . should not be applied for the same reason."  Id. at *6-7.

Under New Jersey law, "a party's waiver of statutory rights must be clearly and unmistakably established, and contractual language alleged to constitute a waiver will not be read expansively."  Garfinkel, 773 A.2d at 670 (internal quotations omitted).  To be unambiguous, a provision should state that it encompasses "all statutory claims arising out of the employment relationship or its termination," including at least a general reference to "the type of claims included in the waiver, e.g., workplace discrimination claims."  Id. at 672.  The provision in Nuzzi found to be insufficient provided: "This Agreement shall be governed and construed in accordance with the laws of the State of California and any claims or disputes arising out of, or related to this Agreement will be determined by binding arbitration upon the petition of either

party in San Francisco, California."  2009 U.S. App. LEXIS 18000, at *2.  Here, the contract

simply provides that "[a]ll disputes between the parties arising out of the employment relations or

connected therewith, will be settled by the UAE courts of law and according to the UAE law."

Although the contract provision in this case is broader than the one in Nuzzi, encompassing all

disputes arising out of the employment relationship, there is no indication in the contract that the

provision includes statutory discrimination or retaliation claims.  Therefore, this Court finds that

the forum selection clause and choice of law provision do not encompass Mr. Kanafani's New

Jersey CEPA claims.

Aside from the contractual provision, Lucent argues that New Jersey law is not applicable

in this case.  Mr. Kanafani was employed by LTII in the UAE, not by Lucent in New Jersey, and,

therefore, a CEPA claim against it is not valid.  "New Jersey law does not regulate conduct

outside the state[;] . . . New Jersey law regulates conduct in New Jersey."  D'Agostino v. Johnson

& Johnson, Inc., 628 A.2d 305, 318 (N.J. 1993).  For this reason, "New Jersey Courts have

consistently applied the law of the *state of employment* to claims of workplace discrimination."

Peiken v. Kimmel & Silverman, P.C., 576 F. Supp. 2d 654, 657 (D.N.J. 2008) (emphasis in

original).  Here, Mr. Kanafani's place of employment was the UAE, and he was terminated by Mr.

Bursh in the UAE.  But, Mr. Kanafani argues that his "employment was intimately tied to New

Jersey," and that Lucent, LTII's parent, was directly involved in the decision to terminate his

employment because of his whistle-blowing activity.  (Opp'n Br., at 2, 15.)

In D'Agostino, a plaintiff, who was terminated by a Johnson & Johnson ("J&J")

subsidiary located in Switzerland, alleged that "J&J officials ordered and directed the plan to

dismiss him."  628 A.2d at 306, 320.  The court, in reversing a grant of summary judgment, held

that if J&J officials were directly involved with the plaintiff's termination for failure to go along with a bribe even though the Swiss subsidiary was the entity that actually terminated plaintiff's employment, then New Jersey interests were implicated and New Jersey was an appropriate forum.  Id. at 321; Norris v. Harte-Hanks, Inc., 122 Fed. Appx. 566, 569 (3d Cir. 2004) (an unpublished opinion affirming summary judgment on a plaintiff's CEPA claim where there was no evidence that the New Jersey employer "engineered the [alleged] misconduct" or "influenced the decision to terminate [plaintiff's] employment"); Peiken, 576 F. Supp. 2d at 656 ("[A]ll of the allegedly discriminatory conduct at issue in this case took place outside of New Jersey.")  Lucent argues that "the record is clear that [Mr.] Bursh, as LTII's president and without input from Lucent in New Jersey, terminated Plaintiff's employment."  (Reply Br. in Supp. of Def. Lucent Tech. Inc.'s Mot. for Summ. J. [hereinafter "Reply Br."], at 6 (citing Mr. Bursh's testimony).)  It also argues that "the evidence is . . . clear that [Mr.] Rosen did not forward [Mr. Kanafani's] e-mail to [Mr.] Bursh, or tell [Mr.] Bursh about the e-mail."  (Id., at 7 (citing Mr. Bursh testimony).)  Also, Mr. Brewington testified that he did not even know Mr. Kanafani at the time of his termination.  Thus, Lucent argues, unlike in D'Agostino, there is no material issue of fact that "(1) Lucent was not involved in the alleged 'scheme' alleged by plaintiff in his anonymous e-mail; and (2) Lucent's New Jersey facility did not direct LTII to terminate plaintiff's employment."  (Id., at 12.)  This Court disagrees.

Mr. Kanafani was trained by Lucent on the FCPA and Sarbanes Oxley.  LTII employees were told to report any concerns regarding compliance with these laws to Lucent's New Jersey headquarters.  It is undisputed that Mr. Kanafani sent his complaints directly to Lucent, and that Mr. Rosen informed him that Lucent would lead the investigation into his complaints.  Mr. Taylor

testified that he was shown copies of the e-mails by Mr. Steinen and that Mr. Bursh also discussed the second email with him, implying that the emails had been forwarded by Lucent to LTII.  Mr. Taylor further testified that he believed that Mr. Steinen and Mr. Bursh were upset by the complaints and were actively trying to identify the e-mail author.  Mr. Taylor testified that Mr. Bursh told him that he was going to ask Lucent to see if they could trace the e-mails.  Mr. Kanafani testified that Mr. Taylor told him that they had some "suspects" for who had sent the e-mails.  Mr. Brewington, a Lucent New Jersey employee, oversaw LTII operations, and Mr. Bursh reported directly to him.  Mr. Bursh testified that, as part of his oversight of LTII, Mr. Brewington would discuss with him LTII's compliance with the FCPA.  Therefore, the evidence could support a finding that Lucent officials were actively involved in compliance issues in general and in the investigation of Mr. Kanafani's complaints in particular.

Additionally, the evidence, viewed in a light most favorable to Mr. Kanafani, could support an inference that there was animus by Mr. Bursh toward the sender of the e-mails.  For reasons discussed more fully in Section D., _infra_, this Court finds that the evidence presented could support a finding that Mr. Bursh terminated Mr. Kanafani in retaliation for his complaints.  A fact-finder could reasonably infer that such a decision could not be made by Mr. Bursh without the agreement or acquiescence of Lucent officials in New Jersey given the oversight of LTII and its extensive involvement in compliance issues, including Mr. Kanafani's complaints.  Additionally, even if Lucent was not originally involved in the underlying alleged FCPA and Sarbanes violations, Mr. Kanafani's complaints put them on notice of possible violations.  A factfinder could find that, if Lucent did not act properly on the complaints, it had ratified the alleged misconduct.  See Estate of Roach v. TRW, Inc., 754 A.2d 544, 552-53 (N.J. 2000).

Therefore, the Court finds that this case is analogous to D'Agostino and that New Jersey law is applicable.

### C.   Final Settlement Agreement

Lucent also argues that all of the present claims are barred by the Final Settlement Declaration executed by Mr. Kanafani.  The Settlement Declaration provides that Mr. Kanafani had "no further rights or claims to any past or future payments or reimbursements from the Company."  (Parker Cert., Ex. S.)  Mr. Kanafani argues that "[n]o reasonable reading of [this language] could lead anyone to believe that an employee would be waiving a wrongful termination claim."  (Opp'n Br., at 31.)  This Court agrees.  As discussed above, waivers of statutorily protected rights must be clear and unmistakable.  The language in the agreement relates specifically to wage payments and does not mention other types of claims.  Therefore, the Court finds that the Settlement Declaration does not bar Mr. Kanafani's CEPA claims.

### D.   New Jersey CEPA Claims

A plaintiff must establish the following elements to establish a prima facie CEPA cause of action:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3c[;] (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

Yurick v. State, 875 A.2d 898, 903 (N.J. 2005); see also Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 404 (3d Cir. 2007).   Here, Lucent does not contest the first three elements.

But, it argues that Mr. Kanafani has failed to establish that a causal connection exists between his complaints and his termination.

There are many ways a plaintiff may demonstrate causation to establish a prima facie case, "as the proffered evidence, looked at as a whole, may suffice to raise the inference." Kachmar v. Sungard Data Sys., 109 F.3d 173, 177 (3d Cir. 1997); see also Estate of Roach, 754 A.2d at 551. Inferences supporting causation may be established, for example, based on evidence of temporal proximity between the adverse action and the protected activity or evidence of a pattern of antagonism or evidence showing that the employer gave inconsistent reasons for the adverse action. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000); see also Fasold v. Justice, 409 F.3d 178, 189-90 (3d Cir. 2005) ("We have held that when only a short period of time separates an aggrieved employee's protected conduct and an adverse employment decision, such temporal proximity may provide an evidentiary basis from which an inference of retaliation can be drawn."). But, for causation to exist, there must be evidence to support a finding that the decision-makers knew about the protected activity. See Caver v. City of Trenton, 420 F.3d 243, 258 (3d Cir. 2005) ("[R]etaliatory motive on the part of non-decision-makers is not enough to satisfy the causation element of a CEPA claim.").

Once a plaintiff establishes a prima facie case, "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's action." Zive v. Stanley Roberts, Inc., 867 A.2d 1133, 1140 (N.J. 2005); see also Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994). If the employer offers a legitimate non-retaliatory reason, "the burden of production shifts back to the employee to prove by a preponderance of the evidence that the reason articulated by the employer was merely a pretext for discrimination and not the true reason

for the employment decision." Zive, 867 A.2d at 1140.  Although "[t]he plaintiff retains the

ultimate burden of proving that the retaliatory motive played a determinative role in the adverse

[employment] decision," Donofry v. Autotote Sys., Inc., 795 A.2d 260, 270 (N.J. Super. Ct. App.

Div. 2001), for purposes of a summary judgment motion, to raise an issue of material fact as to

whether the reason is pretextual, a "plaintiff [only] must point to some evidence, direct or

circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's

articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more

likely than not a motivating or determinative cause of the employer's action," Fuentes, 32 F.3d at

764.  "Thus, if the plaintiff has pointed to evidence sufficiently to discredit the defendant's

proffered reasons, to survive summary judgment the plaintiff need not also come forward with

additional evidence of discrimination beyond his or her prima facie case."  Id.  But, it is not

enough to show that the employer's decision was merely "wrong or mistaken," the "plaintiff must

demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

the employer's proffered legitimate reasons for its action that a reasonable factfinder could

rationally find them unworthy of credence, and hence infer that the employer did not act for [the

asserted] non-discriminatory reasons."  Id. at 765 (internal citations and quotations omitted).

    1.    June 2006 Termination

    Lucent argues that the evidence presented cannot establish causation.  It argues that it is

undisputed that Mr. Bursh made the decision to terminate Mr. Kanafani's employment without

any input from New Jersey, that Mr. Bursh was not aware who sent the e-mails when he

terminated Mr. Kanafani, and that he did not receive a copy of the email signed "Thanks, Fadi."

Thus, Lucent argues, there is no evidence supporting a finding that Mr. Bursh was aware of Mr.

Kanafani's complaints when he terminated him.  In support of these assertions, Lucent relies on Mr. Bursh's testimony.  Contrary to Lucent's assertions, the Court finds that the evidence presented by Mr. Kanafani demonstrates that these facts are disputed.  Mr. Bursh acknowledged receiving the anonymous e-mail entitled "FCPA Infraction."  Although Mr. Bursh said that the subsequent email, signed by Mr. Kanafani, was not "shared with him," Mr. Taylor testified that Mr. Bursh discussed this e-mail with him.  Even without Mr. Taylor's testimony, a reasonable inference from this evidence is that if Mr. Bursh, head of LTII, received one of the e-mails, that he received the subsequent e-mail as well.  Additionally, both Mr. Taylor and Mr. Bursh testified that there was only one "Fadi" employee at LTII.  This is sufficient to support an inference that Mr. Bursh was aware of the e-mails and knew or suspected that they were sent by Mr. Kanafani.

The question then becomes whether there is evidence to support a finding that Mr. Bursh's termination decision was motivated by or caused by Mr. Kanafani's complaints.  First, Mr. Kanafani was terminated shortly after sending his complaints to Lucent; he was terminated approximately two months after sending the first e-mail.  Second, Mr. Kanafani has testified that after sending the e-mails he began having problems getting cooperation from management on his projects and that management behavior towards him changed, making his job more difficult.  Mr. Taylor testified that he believed that Mr. Steinen and Mr. Bursh were upset about the emails, the first of which, the "FCPA Infraction" e-mail, was undisputably seen by Mr. Bursh and named him in connection with the alleged misconduct.  Mr. Kanafani testified that the procedure for his termination was unusual– he was escorted out of the building by security immediately, his computer was confiscated, and his telephone cancelled immediately.  Unlike Mr. Kanafani's termination, Mr. Alamoudi certified that when he was terminated as part of a RIF in 2007, he was

permitted to work his notice period and not escorted out of the building.

Most importantly, the evidence presented by Mr. Kanafani highlights inconsistencies in Mr. Bursh's testimony with respect to what he knew as well as why he terminated Mr. Kanafani. Mr. Bursh testified that he never discussed who sent the e-mails with anyone and that he "certainly did not ask anyone within the company to trace the emails."  On the other hand, Mr. Taylor testified that he and Mr. Bursh had a discussion about who sent the e-mails and about tracing the e-mails.  Mr. Bursh stated that he included Mr. Kanafani in the RIF because he "had nothing going on in terms of future sales and had sold something recently," but Mr. Taylor, the former Director of Sales Operations at LTII, testified that he was surprised by Mr. Kanafani's termination because Mr. Kanafani "was probably one of three salesmen that were delivering on their [sales] plan and had a chance of surpassing their plan for the year."  Additionally, Mr. Kanafani had a history of being a top salesman while at LTII; evidence shows that he was recognized for his significant contributions to sales efforts in 2003, 2004, and 2005.  Mr. Taylor also testified that certain sales efforts were not only stalled but "went nowhere" after Mr. Kanafani's termination, from which an inference could be drawn that Mr. Kanafani's position was not redundant.

Based on the foregoing, including the temporal proximity between Mr. Kanafani's complaints and the termination, the alleged antagonist behavior after the complaints, and the inconsistencies between Mr. Bursh's testimony and other evidence, this Court finds that there is a genuine issue of fact as to whether Mr. Bursh's decision to terminate Mr. Kanafani was caused by Mr. Kanafani's complaints.  Additionally, as discussed in Section B., supra, given that Mr. Bursh reported to Mr. Brewington, Mr. Brewington's oversight of LTII including involvement in

compliance issues, and the reports of the complaints to Lucent in New Jersey and its involvement in the investigation, a fact finder could infer that Mr. Bursh made the decision to terminate Mr. Kanafani with the agreement and involvement of Lucent in New Jersey.  Mr. Kanafani has established a prima facie case under CEPA for his June 2006 termination.

Having established a prima facie case of retaliatory discharge, the burden now shifts to Lucent to provide a legitimate non-retaliatory reason for Mr. Kanafani's termination.  Lucent asserts that his termination was part of a RIF due to economic cost-cutting.  Thus, Lucent argues that in order to establish pretext, Mr. Kanafani must show that LTII laid off other employees as a pretext for terminating him because of his complaints. The Court disagrees.  Mr. Kanafani must only show that he was impermissibly included in the RIF because of his complaints.  As discussed above, this Court finds that Mr. Kanafani has met this burden by demonstrating inconsistencies in Mr. Bursh's testimony sufficient for a fact finder to find that Mr. Bursh's preferred reasons for Mr. Kanafani's termination are "unworthy of credence."

2.    September 2006 Failure to Hire

Mr. Kanafani argues that failure of Lucent in Texas to hire him constitutes a separate CEPA violation.  Lucent argues that, even if Lucent is an appropriate defendant for this claim, that Mr. Kanafani was not a LTII or Lucent employee at the time, and, therefore, the decision not to hire him is not covered by CEPA–there was no retaliatory action, a required CEPA element.  A retaliatory action is defined as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment."  N.J. Stat. Ann. § 34:19-2(e).  Therefore, actions take after an employee's termination cannot support a CEPA claim.  See Beck v. Tribert, 711 A.2d 951, 955-56 (N.J.

Super. Ct. App. Div. 1995).

Here, Mr. Kanafani was informed of Lucent's offer of employment in Texas on or around September 6, 2006, after his employment with LTII officially ended on August 31, 2006. He was told that Lucent could not actually extend him an offer on September 20, 2006. Thus, all of the interaction between Mr. Kanafani and the Lucent Texas employees occurred after his employment with LTII ended. Mr. Kanafani points to Abbamont v. Piscataway Township Board of Education, 650 A.2d 958 (1994), to support his position that a failure to rehire can constitute a retaliatory CEPA action. This Court finds Abbamont distinguishable from the present case. In Abbamont, the plaintiff had not been terminated from the school district and was still employed by them when he was informed that his contract would be renewed; the failure to rehire decision was the effective termination of his employment with the school. Id. at 961, 966.

Also, Mr. Kanafani, in his opposition brief, appears to base this allegation on his belief that Mr. Bursh or someone at LTII intentionally removed him from the LTII system so that he would have to be considered as an external versus an internal candidate, making it more difficult for him to be hired by Lucent in Texas. However, the facts presented do not support this broad conclusion. Pursuant to his Settlement Declaration Mr. Kanafani's last day with LTII was August 31, 2006. There is no evidence that this date was manipulated by Mr. Bursh or anyone else at Lucent or LTII once Mr. Kanafani was being considered for the Texas position. In fact, Mr. Taylor testified that he relayed to Mr. Rosenthall that LTII's human resources was willing to keep Mr. Kanafani as an active employee if Mr. Rosenthall could commit to hiring him, which he could not do at that time. Mr. Kanafani also has not presented any evidence that the decision-makers in Texas were aware of his complaints regarding LTII. Therefore, this Court finds that Mr. Kanafani

has failed to establish a prima facie CEPA case with respect to Lucent's failure to hire him in September 2006; summary judgment on this claim is granted

## IV.   <u>**CONCLUSION**</u>

For the foregoing reasons, this Court grants in part and denies in part Defendant's motion for summary judgment. An appropriate Order accompanies this Opinion.

DATED: September 18, 2009          /s/ Jose L. Linares
                                                     JOSE L. LINARES
                                                     UNITED STATES DISTRICT JUDGE